# THE SUPREME COURT

### OF

## PENNSYLVANIA.

### WESTERN DISTRICT—PITTSBURGH 1877.

85    127
226   2  27

## Kehoe *versus* The Commonwealth.

1. Where several parties unite to make an assault, which results in homicide the acts and declarations of the defendant immediately prior to the assault, what was said in his presence by those acting in concert with him, and what occurred after the attack, are competent evidence.

2. In a trial for homicide it was shown that the deceased was terribly beaten and left insensible by his assailants. He was carried to a house near by, and on the following morning started to his home, about a mile distant, unaccompanied and on foot. About midway to his home he was met by an acquaintance, whom he accosted, saying, "Bill, it is all up with me; I will never get over it;" and then went on to speak of his wounds and how they were inflicted, and from the effects of which he died two days thereafter. *Held*, that this evidence was properly received as dying declarations.

3. Where one has been convicted of an infamous crime, but not sentenced, and motions in arrest of judgment and for a new trial are pending, he is not a competent witness for another who was jointly indicted for the same offence and granted a separate trial.

4. Where several parties are jointly indicted and separate trials granted, one who has not yet been tried is not a competent witness for either of the others on trial.

5. *It seems* that when the essential ingredients of murder at common law, or murder of the second degree, under our code, are shown to exist, the burden of raising the grade to murder of the first degree devolves on the Commonwealth.

6. All the ingredients necessary to constitute murder of the first degree were found to exist in this case.

[Kehoe *v.* Commonwealth.]

October 1st 1877. Before AGNEW, C. J., SHARSWOOD, MERCUR, GORDON, PAXSON, WOODWARD and STERRETT, JJ.

Error to the Court of Oyer and Terminer of *Schuylkill county:* Of July Term 1877, No. 29. Certified from the Eastern District.

Indictment of John Kehoe for the murder of Frank W. S. Langdon. On the night of. Saturday the 14th of June 1862, Langdon was severely beaten at Audenreid, in Carbon county, and died from the effect of his injuries, at his house in Schuylkill county, on the following Tuesday. About fifteen years thereafter John Campbell, Neal Dougherty, John Kehoe, Michael McGee, Columbus McGee and John Chapman, were charged with and jointly indicted for the murder. Each defendant demanded a separate trial, which was granted, and Campbell and Dougherty were severally tried and convicted of murder in the second degree.

On the 9th of January 1877, before Pershing, P. J., the trial of Kehoe commenced. From the evidence disclosed therein it appeared that Langdon was what was called a " ticket boss" at a colliery, whose duty it was to see that the coal taken from the mines was clean, and if not, to " dock" the delinquent diggers. By his conduct as such " ticket boss" it seemed he incurred the ill-will of the workmen, and a combination was formed to kill him. Kehoe, it appeared, was party to this scheme, and about three weeks before the fatal occurrence. which resulted in Langdon's death had said to Langdon, " You son of a bitch, I will kill you before long, because you are robbing me and robbing the men, by your docking." It was claimed, however, that this remark was made while Kehoe was under the influence of liquor.

On the evening of the 14th of June 1862, a meeting of citizens was held at Williams's hotel, in Audenried, to make the necessary arrangements for the celebration of the approaching 4th of July. Langdon was active in getting up the meeting. Kehoe was there and seemed bent on creating a disturbance. It was shown that in the procession, previous to the meeting, he had taken a flag from Langdon and struck him with it. He spat upon the flag afterwards, and upon remonstrance being made said, he " would do worse than that before he went home." From the group where Kehoe stood in the crowd pebbles were thrown on the porch where Langdon was, and upon his making his appearance one of the group said, " If they got the son of a bitch off the porch they would kill him." In this group were the other defendants jointly indicted with Kehoe. When the meeting closed and the crowd, which was composed of about two hundred people, dispersed, Langdon started for his home. Shortly thereafter a man cried out, " Don't, don't, for God's sake don't, I have had enough," and the rattle of stones was heard as if thrown against a fence. Witnesses who approached the spot whence these cries came found that Langdon had been violently assaulted, and it appeared that there were six men engaged

[Kehoe v. Commonwealth.]

in the assault, one of whom was identified as Kehoe. These six men were recognised as among those who had disturbed the meeting, and had been seen together several times during the evening. After leaving the hotel, Langdon, it appeared, was first assaulted and knocked down by Campbell, and left insensible on the street. He was again attacked while lying there by a party of men, who cast stones at him, some of them weighing two to two-and-half pounds. After lying a short time Langdon regained his feet and tried to escape, but was again followed, and, as the Commonwealth alleged, was again twice knocked down by Dougherty and Kehoe. Shortly thereafter, when found, Langdon was unconscious and terribly lacerated and wounded, from the effects of which injuries he died three days later at his home in Schuylkill county. When found he was carried to the hotel, and the next morning walked to his home, about a mile distant. Very soon after the occurrence it was in evidence that Kehoe and Dougherty were in a saloon not far from where the assault was made, and that they walked up to the bar and one of them remarked, witness thought it was Kehoe, "that they had just been twenty minutes coming from Beaver Meadows," which was four miles distant, and that Dougherty had a handkerchief over his eye, and said he met a person on the road with a bottle of whiskey and some of it had got in his eye. William King also testified that he met Kehoe, the morning after the affray, and that Kehoe said to him, "They killed Langdon last night;" that witness said "What?" and Kehoe replied, "The boys gave him a devil of a beating," or "a hell of a beating, last night." Shortly after the death of Langdon, Campbell and others were arrested in Carbon county, but the grand jury ignored the bill. No further proceedings were had until these were instituted in June 1876, when a true bill was found against all the above-mentioned defendants.

At the trial it was contended, on the part of the defendant, that the testimony relative to the acts and declarations of Kehoe, prior to the assault upon Langdon, and what was said by others with whom it was alleged he was acting in pursuit of their common purpose to attack Langdon, as well as what occurred after he was attacked, should be excluded, and the refusal of the court to do so constituted the assignments of error from one to five inclusive, and the eighth and ninth. These acts and declarations have been chiefly detailed in the foregoing statement of the case.

When on his way home, the morning after the assault, Langdon was met by an acquaintance named Canvin, to whom he said, "Bill, it is all up with me; I will never get over it." Canvin then tried to encourage him, and remarked he would get over it; and Langdon again said, "Oh, no!" Upon inquiry as to why he had started home, he repeated what he had before said. The Commonwealth then proposed to have Canvin state what Langdon had said about his injuries and how he was beaten, to which objection was made on

[Kehoe *v.* Commonwealth.]

the part of the defendant that the declarations which were about to be made were not sufficiently shown to be dying declarations; that Langdon lived two days thereafter, and was at this time able to travel without assistance on his way home, half the distance of which he had then traversed. The court allowed the witness to testify, and this constituted the sixth and seventh assignments.

The witness then proceeded to tell what Langdon had stated, which in substance was that he had been three times assaulted and knocked down.

To contradict the testimony of the Commonwealth, showing that these several defendants, who were jointly indicted, were in company on the evening in question, the defence called Neal Dougherty. The latter had been convicted of murder in the second degree for this same crime, and a motion in his case in arrest of judgment and for a new trial was pending. The Commonwealth objected to the witness as incompetent, because he had been convicted of an infamous crime charged in the indictment against him, which was still pending and undetermined.

McGee was also offered, to whom objection was made, on the ground that he was a co-defendant in the indictment with Kehoe; that he had elected to be tried separately, and had not yet been tried.

Both these objections the court sustained, and they constituted respectively the tenth and eleventh assignments of error.

The fourth and fifth points of the defendant were as follows, to which are subjoined the answers of the court:—

4. If the jury believe the evidence of James Shearer and John Cook, that the defendant, Kehoe, was with them in front of the hotel at the time Langdon was beaten and stoned, and that Kehoe was not present at the beating and did not participate therein, the verdict of the jury should be for the defendant.

Ans. "To this we say, yes, with this qualification; that if the jury find from the evidence, that the defendant, as claimed by the Commonwealth, entered into a combination or conspiracy with the other defendants to procure the killing of Langdon; if he counselled the act or procured it to be done, he would be guilty as an accessory before the fact, although absent at the time of the commission of the crime. If present, aiding and abetting, although he did not strike the blow, he would be equally guilty, in the eye of the law, with those who actually did the beating.

5. If the jury believe that a prosecution against John Campbell and others was commenced in Carbon county shortly after Langdon was beaten, and that Young, Horne and others, who now identify Campbell as the person who struck a blow and felled Langdon to the ground, were present before the grand jury and gave their evidence as they then remembered the circumstances, and that the prosecution failed, the jury may take into consideration such facts in

[Kehoe v. Commonwealth.]

connection with the fact, that from the long time (fifteen years) which has elapsed since the injuries were done to Langdon, that there is a strong probability that witnesses may have forgotten the order of events, the particular time of their occurrence and the persons who participated therein, as well as the identity of those whom they supposed they saw.

Ans. " The facts in connection with the legal proceedings in Carbon county have been stated by the witnesses and are for the consideration of the jury. In affirming that we may observe, as the matter has been incidentally discussed, although it is no necessary part of our instruction to the jury, that at one time when a party was beaten in one county and died in another, it was held that the perpetrators of the crime could not be tried in either county, because in neither was the offence complete. It appearing that Langdon was beaten in Carbon county and that he died in Schuylkill county, the existing statute gives jurisdiction of the case to this court."

The defendant was convicted of murder in the first degree, and was sentenced to be hanged. He then took this writ, his assignments of error being those heretofore noted.

A. Campbell, S. A. Garrett and John W. Ryan, for plaintiff in error.—It is not denied that when a party has committed a crime, preparations looking towards it, opportunities sought to accomplish it, may be given in evidence to strengthen the probabilities of his guilt ; but the circumstances offered in evidence must be such as to impress a reasonable mind with conviction that they are the proper surroundings of the crime charged. A reasonable doubt about the bearing of any fact in a case of this character requires the rejection of the offer. The court here permitted detached circumstances in evidence to be shown, having no probable or apparent connection with the offence charged, for the purpose of procuring a verdict of murder in the first degree, where there had been two verdicts of murder in the second degree against parties charged with participation in the same crime.

Dying declarations are not admissible, unless it appears that they were made under a sense of impending dissolution and a consciousness of the awful occasion. Langdon was beaten about a mile from his home, and on the following morning left the hotel, on foot, without company or assistance, and walked to his own dwelling. About midway there he met Canvin, who walked with him to within two hundred feet of the house, when Langdon asked him to proceed no further, lest his wife might think he was injured worse than he was. Two days afterwards Langdon died. It was while on the way to the house that the declarations were made. Were they dying declarations ?

It is the judgment of the court, and not merely conviction, which

[Kehoe *v.* Commonwealth.]

disqualifies a witness. Nor is it a valid objection that the witness is a party to the record, if not otherwise interested in the case. A party defendant may be called by the prosecution, if willing to testify, and give evidence against himself and co-defendants. In England this is well settled doctrine: Worrell *v.* Jones, 7 Bing. 395; Mant *v.* Mainwaring, 8 Taunt. 139; Pipe *v.* Steele, 2 Q. B. N. S. 733; Whitehead *v.* Bank of Pittsburgh, 2 W. & S. 172 ; Mevey *v.* Matthews, 9 Barr 112; Paine *v.* Tilden, 20 Vermont 654 ; Moddewell *v.* Keever, 8 W. & S. 65; Johnson *v.* Blackman, 11 Conn. 342; Woodruff *v.* Westcott, 12 Id. 134 ; Bowen *et al. v.* Burk *et ux.*, 1 Harris 146; Kennedy *v.* Philipy, Id. 408. It is not, therefore, sufficient ground for the exclusion of a witness that he is a party to the record.

It is the general doctrine that where the suit is ended as to one of several defendants, and he has no direct interest in its event as to the others, he is a competent witness, and may be called as a witness on either side of the controversy : 1 Greenlf. on Ev. 470, 473 ; Van Deusen *v.* Van Slyck, 15 Johns. 223 ; Moon *v.* Eldred, 3 Hill 104; Wildwarth *v.* Mountford, 4 W. C. C. R. 79.

So in criminal prosecutions, one of several persons jointly indicted may be rendered competent to give evidence, either for the prosecution or for defendants, as if one plead guilty, he is a competent witness, before sentence, on the trial of the others : Rex *v.* Henks, 2 C. & K. 462 ; Rex *v.* Fletcher, 1 Stra. 633 ; Rex *v.* George, C. & M. 111; Commonwealth *v.* Smith, 12 Metc. 238 ; Commonwealth *v.* Marsh, 10 Pick. 57 ;. People *v.* Bill, 10 Johns. 95 ; Regina *v.* Hinks, 1 Denison 84 ; People *v.* Donnelly, 2 Parker 182; Shay *v.* Commonwealth, 12 Casey 305.

It was contended also that the weight of the evidence did not sustain a verdict of murder in the first degree, and its careful scrutiny was therefore invoked by the prisoner's counsel.

As no assignment was made to this effect, the chief justice suggested that such an assignment should be made, and in pursuance thereof it was done, and the contention of counsel thereon was that there was no evidence to show a deliberate intent to take life, and nothing in the weapons used to indicate such intent.

*George R. Kaercher* (District Attorney), *Guy E. Farquhar, Charles Albright* and *F. W. Hughes,* for the Commonwealth.— The acts and declarations were those of Kehoe immediately prior to the beating of Langdon, as well as those of parties concerned with him in the murder. · They were made, as alleged by the Commonwealth, by those parties while in pursuit of their purpose to kill Langdon, and were relevant and material. ·

The nature and character of the injuries inflicted are to be considered, in connection with the declarations of the party, in determining the state of his mind at the time the declarations were made.

[Kehoe *v*. Commonwealth.]

Death may not ensue for a long time afterwards, still the declarations made under the belief that death is impending as the result of the injuries received, will render the evidence admissible.

The admissibility of such testimony is a question of fact for the determination of the court under all the evidence before it. The judgment of the court upon the facts is not to be reversed unless it plainly appear that error has been committed: Fife *et al*. *v*. Commonwealth, 5 Casey 437 ; Phillips on Evidence, vol. 1, pp. 3, 5 and 7 ; McCorkle *v*. Binns, 5 Binn. 340 ; Hemphill *v*. McClimans, 12 Harris 370.

It was decided in Shay *v*. Commonwealth, 12 Casey 305, that an untried joint defendant cannot be a witness. See also Staup *v*. Commonwealth, 24 P. F. Smith 462.

It is claimed by the plaintiff in error, that while it is a general rule that a party to an action cannot be a witness, yet that by the conviction of a party, he ceases to be a party to the record and may be a witness. That though the conviction may be of an infamous crime, yet until sentence be pronounced he is not disqualified on the ground of infamy. This, if true, would place a party convicted of an infamous crime in the position of being a competent witness, while his unconvicted and presumably innocent co-defendant, under the ruling in Shay *v*. The Commonwealth, would be incompetent as a witness.

The authorities cited by the counsel, only go to the extent of establishing that a co-defendant may in certain cases be a witness, where upon a conviction, the case as to him is at an end, as where he has endured the punishment, or paid the fine, &c. The case must, as to the party, be at an end. Now with a motion in arrest of judgment, and for a new trial pending, the case of Dougherty was not at an end, as to him. At no period in the case, was it more the interest of Dougherty, than when struggling to reverse the verdict against himself, to furnish exculpatory testimony in behalf of his co-defendants, who, being freed by his testimony, would become competent witnesses for him, in the event of his being granted a new trial : Greenl. on Ev., vol. 1, sect. 363 ; The State *v*. Young, 39 N. H. 283 ; Kirk *v*. Ewing, 2 Barr 455 ; Given *v*. Albert, 5 W. & S. 333 ; Commonwealth *v*. Lewis 10 Pick. 57 ; Wolf *v*. Finks, 1 Barr 439 ; Cambria Iron Co. *v*. Tomb, 12 Wright 394 ; Parke *v*. Bird, 3 Barr 360 ; Irwin *v*. Shumaker, 4 Id. 177 ; Lies *v*. Stub, 6 Watts 48 ; Stub *v*. Leis, 7 Id. 43 ; Marshall *v*. Bank, 1 Casey 386 ; Noble's Adm'rs *v*. Laley, 14 Wright 284 ; Swanzey *v*. Parker, 14 Id. 454.

It was argued also that the evidence sustained the verdict, and that the intent to kill was manifest in the threats made. In response to a query from the court as to whether then it was not necessary to show that the party who made the threats did the killing, counsel contended that there was no evidence to show what was the

mortal wound, and that Kehoe was present when the concerted effort was made and the numerous and repeated blows given.   The court again suggested that there may have been malice and an intent to beat severely, but was there evidence of an intent to take life and counsel argued that whether the intent was to kill or beat was a question for the jury, and they had found that it was the former.

Mr. Justice STERRETT delivered the opinion of the court, January 7th 1878.

The plaintiff in error was indicted jointly with five others for the murder of Frank W. S. Langdon, charged to have been committed at Audenried, on the 14th of June 1862.   The defendants each demanded a separate trial, which was granted.   The assignments of error relate exclusively to the trial of John Kehoe, and we are not called upon to consider the legal status of any of the other defendants, except in so far as it may have affected their competency as witnesses, or otherwise have a legitimate bearing on the present case.

The testimony before the jury was of such a character as to leave no reasonable doubt on their minds that an atrocious murder was committed upon the person of Langdon, and it was equally clear that several persons were concerned in its commission.   A great deal of testimony, direct as well as circumstantial, was introduced for the purpose of showing that John Kehoe participated in the homicide, and it thus became a question of fact exclusively for the jury.   By their verdict, the felony charged in the indictment, as well as his guilty participation therein, has been conclusively established.   It is very clear to our minds that the testimony was quite sufficient to warrant a verdict of guilty ; but it is claimed that it did not justify the jury in finding the higher grade of murder.   This would be so if there was no testimony from which the jury might fairly and reasonably find that the killing was wilful, deliberate and premeditated, as well as malicious and without justification or excuse.

When the essential ingredients of murder at common law, or murder of the second degree, under our code, were shown to exist, the burthen of raising the grade to murder of the first degree devolved on the Commonwealth.   The previous threats of the prisoner, the nature and circumstances of the attack on the deceased, and the atrocious severity of the injuries inflicted on his person, were mainly relied on for the purpose of proving the intent to kill.   It was shown that Langdon was " ticket boss" at the colliery, and as such it was his duty to see that the coal, as it came out of the mine, was clean, and if not, to dock the delinquent diggers ; that complaints were made of his docking, and about three weeks before he was murdered, Kehoe threatened to kill him, because he was rob-

bing him and others there by his docking. It may be said that Kehoe was somewhat intoxicated at the time, and that his threats were mere idle bravado, intended to intimidate Langdon. It is true the witness says he was " in liquor," but it by no means follows that he did not mean what he said. When men are under the influence of liquor, they are perhaps more unguarded and outspoken than when duly sober. The testimony tends to show that Langdon had become obnoxious, especially to Kehoe, on account of the manner in which he discharged his duties as " ticket boss," and that in making the threats he was actuated by feelings of hatred and revenge. These, however, were matters of fact to be determined by the jury. In endeavoring to discover the motive and intention of the prisoner, they would naturally and properly consider, among other things, the inhuman manner in which Langdon was assaulted and beaten without provocation; the fiendish cruelty with which his assailants persevered in their wicked purpose, even after he had begged them to desist and spare his life. When these and all the attendant circumstances are taken into consideration, in connection with the previous threats to kill him, there was quite sufficient before the jury to warrant the conclusion that they intended to carry the threat into execution. Doct. Dimmick and other witnesses, who speak of the condition in which Langdon was found, describe his head as " almost a complete mass of wounds and bruises." They say, " in fact his whole head was a mass of wounds, more particularly about the posterior part;" one of his ears was lacerated and almost severed from his head; his nose and lip were cut through, and some of his teeth knocked out. It was satisfactorily shown that death resulted from the injuries in less than three days; and if he had not been a man of vigorous constitution he could not have survived so long. If it may be presumed that men intend the natural and ordinary consequences of their acts, it required no strained inference to reach the conclusion that they intended to beat him to death. But the jury had no occasion to rely exclusively on any such presumption. The previous threats and subsequent conduct of the prisoner tended strongly to the same conclusion. When he met the witness, William King, early next morning, he said " I was up at Pottsville last night, and they killed Langdon." How came he to use this expression if the idea of killing Langdon had not been previously entertained ? Scattered throughout the testimony there are a number of facts and circumstances which tend to connect the prisoner with the murder, and at the same time justify the jury in determining the degree as they did. It is unnecessary to refer to them in detail or at greater length than has been done. They all appear to be consistent with the theory upon which the verdict, must have been based, and at the same time irreconcilable with any reasonable hypothesis of the prisoner's innocence. The body of the offence was clearly established. There could be no doubt that

[Kehoe *v.* Commonwealth.]

Langdon was murdered, and the evidence was amply sufficient to justify the jury in finding that the prisoner was one of the guilty parties, and that the grade of his offence was murder of the first degree. A careful review of the evidence satisfies us that " all the ingredients necessary to constitute murder of .the first degree were proved to exist." The supplemental error, assigned at bar during the argument, is, therefore, not sustained.

The first five, together with the eighth and ninth assignments of error, relate to the conduct and declarations of Kehoe immediately prior to the beating of Langdon, and what was said in his presence by others with whom it was alleged he was acting in the pursuit of their common purpose to attack Langdon, and what occurred after he was attacked. As has been already remarked, it was very evident that, in the assault on Langdon, there was what at least appeared to be concerted action on the part of several persons with whom Kehoe was associated; and it would have been impossible for the jury to have had an intelligent understanding of the case without being informed as to the facts and circumstances leading to and connected with the main transaction. Many of the matters embraced in these assignments fall properly under the head of *res gestœ;* and while some of them may have had but little if any bearing on the case, we are unable to see that the prisoner could have been, in any way, unduly prejudiced by any of the testimony to which objection was made. As a general rule, everything that pertains to the proper surroundings of the crime charged is admissible. We cannot say that the rule was violated in this case. The length of time that has elapsed—nearly fifteen years—between the commission of the offence and the date of trial, made it more difficult to develop the facts of the case without the introduction of some unimportant circumstances, the relevancy of which may not have been quite clear. We have been unable to discover any material error in the matters complained of in either of the foregoing assignments.

The sixth and seventh assignments relate to the alleged dying declarations. The testimony on which they were admitted appears to show, and no doubt satisfied the court, that they were made by the deceased under a sense of impending dissolution. In determining the state of his mind at the time, the nature and character of the injuries, from which he was then suffering, were to be considered in connection with what he said in regard to their fatal effect; and if he really believed that death was impending as the speedy result of those injuries, his declarations were properly admitted. It was a question for the court, and, while in some respects it may be considered a close one, we think it was rightly determined.

The tenth and eleventh assignments relate to the rejection of Columbus McGee and Neal Dougherty as witnesses, offered on the

[Kehoe v. Commonwealth.]

part of the prisoner, on the ground that they with others were indicted jointly with him for the same homicide, and that Dougherty had been tried and convicted, but not sentenced. In the case of McGee the question presented is, whether, when several persons are jointly indicted and separate trials are awarded, one who has not been tried is a competent witness for one of the others on trial.

This was one of the questions in Shay v. Commonwealth, 12 Casey 305, in which it was held that he was incompetent. This case was followed by Staup v. Commonwealth, 24 P. F. Smith 458, in which the present chief justice, delivering the opinion of the court, says : "Defendants jointly indicted for murder, though severing in their defence, cannot testify for each other. The love of life is too strong to be placed in the balance against truth, and the result might often be that both defendants would be acquitted when both were guilty." A different rule has sometimes been recognised, but the decided weight of authority accords with our own cases.

The case of the other witness, Neal Dougherty, differs only in this, that he had been tried and convicted, but not sentenced, and motions in arrest of judgment and for a new trial were pending at the time he was offered. Was he thereby rendered competent? We think not. It is clear that when the prosecution, as to one of several defendants, is fully ended, either by acquittal, entry of a *nolle prosequi*, or by a verdict of guilty and judgment thereon, he is a competent witness, unless disqualified by the judgment, as in case of sentence for crime of an infamous nature. In such cases it is the judgment that renders the convict infamous, and the disqualification continues until it is removed by pardon or otherwise. In Rex v. Fletcher, 1 Strange 633, two persons were jointly indicted, one of whom pleaded guilty and paid his fine ; it was held by Lord Chief Justice Raymond, that he was a competent witness, for the other, for the obvious reason that the matter was at an end as to him. He was no longer, in any just sense, a party to the record. His testimony could have no possible effect on his own punishment, for that had been inflicted and satisfied; nor upon any subsequent proceedings against him, for, as to him, all proceedings had terminated. But the case is very different when the prosecution has not been ended ; when a verdict of guilty has been rendered, and efforts are being put forth to arrest judgment or secure a new trial. At no period in the progress of the case, perhaps, is the defendant more interested in furnishing exculpatory evidence in behalf of his co-defendants, who, after being liberated by his testimony, would become competent witnesses for him in the event of a new trial. In The State v. Young, 39 N. H. 283, a defendant, who pleaded, *nolo contendere*, but against whom no judgment had been pronounced, was held to be incompetent, as a witness, for his co-defendant. In delivering the opinion of the court, Mr. Justice Fowler says, "it seems, notwithstanding cases to the contrary, that a defendant can-

[Kehoe *v.* Commonwealth.]

not properly be admitted as a witness for his co-defendant, in a criminal case, until he has ceased to be a party to the proceeding. No plea, merely, unless followed by judgment in accordance with it, can operate to remove the disqualification.   So long as he remains a party to the proceeding ; so long as anything remains to be done against him which may, by possibility, be affected by his own testimony, he is incompetent.''   In some cases, confusion of thought has apparently arisen from speaking of the conviction of a defendant as the end of the case.   When conviction, by judgment of the court, is meant, this is correct ; but, when a plea, admitting guilt, or a verdict of guilty, not followed by judgment, is regarded as a conviction which ends the case, it is erroneous.

We are satisfied that both reason and weight of authority concur in the conclusion that neither of the witnesses offered was competent, and therefore no error was committed in rejecting them.

The remaining assignments of error are not sustained, and there appears to be nothing connected with either of them that requires special notice.   The defendant's fourth point was affirmed, with an explanation and qualification, which the circumstances of the case appear to have justified.   The fifth point was substantially affirmed, and the suggestions therein contained were properly referred to the jury for their consideration.   What was said by the court, in the same connection, relative to its jurisdiction of the case, was correct in itself, and in no way calculated to prejudice the defendant.

The learned president of the Oyer and Terminer appears to have conducted the trial with great care and due regard to the rights of the plaintiff in error ; the principles of law involved were fully and clearly explained to the jury, and the testimony was so reviewed and submitted as to leave them entirely free in the discharge of their duties as judges of the facts.   Guided in their deliberations by correct and appropriate instructions, and acting under the solemnity of their oaths, they found the defendant guilty of murder of the first degree.   The record discloses nothing that would justify us in disturbing the judgment.

The judgment of the Court of Oyer and Terminer is affirmed, and it is ordered that the record be remitted for the purpose of carrying the sentence into execution.