## Commonwealth v. Cantanzariti.

*Homicide—Murder of first degree—New trial—Retraction of testimony by witness.*

1. The existence of a motive for a homicide is consistent with, and indicative of, the deliberation and premeditation necessary to convict of murder of the first degree, and is, therefore, material in determining the degree.

2. A threat by the accused to kill the deceased is also an important factor in determining whether the killing was deliberate and premeditated.

3. Where a witness upon a material matter at issue himself swears after the trial that he had committed perjury, a new trial should be granted. The test of materiality is that the witness's evidence at the trial was not merely cumulative, but, if eliminated, proofs would be silent upon the subject.

4. Where the court is in doubt as to whether the verdict would have been different if the testimony in the material matter had been omitted, a new trial should be granted.

5. A, being indicted for the murder of B, pleaded self-defence. At the trial it appeared that the men were good friends. A testified that, without any reason, B attacked him with a knife, and' he shot him in self-defence. There appeared to be no motive for the crime, until C testified that in the summer before the murder A said to him that B had charged him falsely with shooting him in the shoulder, and that he would get B's hide if it took him three years to do it. C was the only witness who testified to a motive or threat by A; there was no other testimony on the subject other than the denial by A. The jury returned a verdict of murder in the first degree. After the verdict C sent for A's attorney, and, in the presence of witnesses, told him that he had never had any conversation with A about B, and that his testimony at the trial was false in every respect. He said that he wanted the court to know that he swore to a lie. He alleged that the police detective had induced him to give this false testimony. He was taken before a justice of the peace and made an affidavit that his evidence in court was false; he subsequently took another affidavit relieving the police detective from any charge of subornation of perjury, but allowed the original affidavit to stand in other respects. This affidavit was filed in court and assigned as the principal reason for the motion for new trial: *Held*, that, under the foregoing principles, a new trial should be granted.

Murder. Motion for new trial. O. and T. Montgomery Co., Nov. Sess., 1921, No. 9.

*A. H. Hendricks*, for Commonwealth.

*J. Ambler Williams* and *Thomas Foulke*, for defendant.

SWARTZ, P. J., April 24, 1922.—The prisoner, Guiseppe Cantanzariti, was charged with the murder of Guiseppe Iannuce. He plead self-defence at the trial. The jury found him guilty of murder in the first degree.

In this decision we shall call Guiseppe Cantanzariti the accused and refer to Iannuce as Joe or the deceased.

On the evening of Sept. 17, 1921, Joe, the deceased, went to a hospital in Norristown with some fruit for a sick friend. He found that his friend had left the hospital. He then carried the fruit to the house where accused boarded, on Franklin Street, in the Borough of Norristown. He met the accused and a fellow-countryman, named Scandoni, at this boarding-house. Joe shared his fruit with the others and they drank a couple of bottles of wine. The three left the boarding-house. Scandoni separated from the others. The latter went to the lodging-house of the accused, who was the sole occupant of the building. They arrived at this house on Washington Street about nine o'clock. It is located about half a block west of Ford Street. Washington Street runs parallel with the Schuylkill River and crosses Ford Street, which leads to the Swedes Ford Bridge. This is a covered structure and spans the said river. It is a toll-bridge. The eastern side of the bridge is used by the tracks of the Reading Railway. The middle course of the bridge

is used as a driveway for vehicles, and on the western side there is a passage-way for foot travelers. These three compartments occupy the entire width of the bridge. The distance to the bridge from the intersection of Washington and Ford Streets is about one block.

On the west side of Ford Street, going toward the bridge, there is a high board fence separating the street from a vacant lot. Several boards had been removed from this fence, and this left an ample opening for a person to pass from the sidewalk into the vacant lot. This opening in the fence is 137 feet from the bridge entrance. On the eastern side of the street, near Washington Street, there is an open shed used by a scrap-iron dealer. Under this shed there is a pump. On the same side of Ford Street and close to the bridge is the house of Annie Signorovitch. Her husband, daughter Julia and her son Arthur live with her.

The bridge is 676 feet long and leads into the Borough of Bridgeport. The canal bridge on Ford Street, in the Borough of Bridgeport, is about 150 feet beyond the south outlet of the river bridge. It has a retaining-wall, the top of which is nearly ten feet above the water of the canal and about one foot higher than the surface of the ground abutting on the wall.

On the west side of Ford Street, in Bridgeport, there is a guard fence running from the canal bridge toward the river bridge. At the end of this guard fence a telegraph pole is located. The distance from the pole to the canal bridge retaining-wall is twenty-four feet.

The surface of the ground from this pole to the canal wall is practically level. The distance from the pole directly across to the canal wall is twenty-four feet. The distance from the bottom of the canal wall across the tow-path to the edge of the canal water is eighteen feet. This open space, including the tow-path, is nearly level. From the bottom of the canal retaining-wall to the water's edge there is a slight fall of the ground.

Joe, the deceased, lived with his family in Bridgeport, and the direct way to his home from the lodging-house of the accused would take him over the Swedes Ford Bridge.

According to the testimony of Mrs. Dimitri, Joe passed her gate on Washington Street on his way to Ford Street. He stopped and talked with her. Her house is one-half block west of Ford Street, and the lodging-house of the accused was five doors farther to the west, on the same side of Washington Street. She testified that Joe was drunk. About five or ten minutes after Joe had passed, the accused followed, also going toward Ford Street and the bridge. She says ten or fifteen minutes after the two men had passed her house, she heard a noise that sounded like a revolver shot; that it appeared to come from the Bridgeport side of the bridge. She also testified that ten or fifteen minutes after the revolver shot, the accused passed her gate, going toward his lodging-house. The defendant declared on the stand that he did not go back to his lodging-house by way of the Ford Street Bridge. He testified that, after the killing of Joe, he ran west on the railroad siding, near the canal bridge, and went as far as the De Kalb Street Bridge over the Schuyl-kill; that he crossed that bridge to Norristown and then came east on Washington Street to his lodging-house. The De Kalb Street Bridge is about one-half mile west of the Ford Street Bridge.

Mrs. Signorovitch, who lived on the east side of Ford Street, next to the bridge on the Norristown side, testified that about half-past nine o'clock on Sept. 17, 1921, she saw the accused enter the opening already described in the high board fence. He remained inside a short time and then came out, crossed over Ford Street to the scrap-yard shed. He went in and came out in

2 D. & C.

Commonwealth *v.* Cantanzariti.

about a minute with a handkerchief in his hand. He recrossed Ford Street and again entered the opening in the board fence and remained inside until Joe passed by the opening. About two or three minutes after Joe went into the bridge, she saw the accused come out of the opening. He hurried to the bridge and crossed over to the railroad tracks on the east side. He could not enter at that point because a box-car was standing at the opening. A gate closed the driveway. He looked through the gate and then turned to the footwalk, passed the watchman, who called him back. He showed something to the gateman. The defendant testified that he exhibited the card that entitled him to a free passage because he was employed by the railway company.

Mrs. Signorovitch and her daughter came to the bridge entrance and saw the accused run across the bridge. She heard some shots about fifteen minutes afterwards. She says she looked out of her second-story window, watching for the return of her husband. She also had some fears for her chickens. This is the reason given for her watchfulness. The mother and daughter saw the accused catch up with Joe before he reached the Bridgeport end of the bridge. They did not see the accused come back after the shooting. The daughter, Julia, and the son, Arthur, corroborate the mother as to the movements of the two men before and after they entered the bridge.

The accused testified that he and Joe walked along Ford Street toward the bridge entrance; that he stood close to the board fence, in the darkness, and attended to a call of nature; that Joe got ahead of him and that he ran after him and overtook him. He denied that he went into the fence opening or into the scrap-yard shed. He declared that he did not step into the fence opening at any time. He does not deny that he crossed Ford Street to the railway tracks on the bridge. He testified that he tripped, and that caused him to move to the other side of the street.

While the three witnesses agree that the accused was within the fence opening when Joe passed by, there is no explanation where Joe passed the time that the accused consumed in going through the various movements described by the three witnesses. They say that the lights at the surroundings were sufficient to enable them to see the occurrences they described. They say that the accused hid behind the fence opening and then crossed over to the scrap-yard and again entered the opening and went into hiding.

The difficulty in following the sequence of the events described by the three witnesses is not solved, when we remember that all declare that the first man they saw was Joe, and yet they are certain that the accused hid behind the fence before Joe passed the opening.

The witness, Russo, called by the accused, testified that he was coming from Bridgeport to Norristown by way of the Ford Street Bridge; that he saw two men standing at the corner of the canal bridge about fifteen minutes after ten. A few minutes after he passed the two men, and while he was still in the bridge he heard three or four shots. The railroad watchman also heard four shots about five or six minutes after Russo had passed him. The said watchman also heard a cry "Mama"—an appeal to the Virgin Mother.

The accused testified that he started out to accompany Joe to his home in Bridgeport; that he promised him some wine if he would do so. He declared that he stopped at the board fence for the purpose already stated and then caught up to Joe. While on the way Joe asked him to get a job for him on the railroad. The accused was track repairman. He replied he would try and get the position for Joe. The accused declares that, after this request and his reply, Joe suddenly turned upon him and said, "You son-of-a-bitch, do you want to go any further;" that Joe pulled a knife out of his pocket

and tried to cut him; that he did cut the sleeve of his coat, and by another blow scraped his arm or wrist; that he was coming towards him with the knife; that he could not get away on account of the wall, and that he then shot four times and that Joe fell down the bank. He says Joe appealed to the Blessed Virgin to save him. He said further that he was afraid that Joe might have some friends who would help him, so the accused ran away.

The bullet that caused death severed a blood vessel near the heart, and the coroner's physician declared that death must have followed in a few seconds. He also stated that the organs disclosed that the man was dead before the body reached the water. The accused testified that Joe struggled on the ground, fell over the wall and rolled into the water of the canal. To do this it would have been necessary to roll and struggle over the level space of more than twenty feet to reach the canal wall, then the body would have to pass over the top of the wall more than a foot above the level of the ground. To reach the water of the canal, the body, after a fall of ten feet, would have to roll a distance of eighteen feet over ground practically level.

The accused accompanied the officers to the canal bridge and pointed out the spot where the shooting occurred at the telegraph pole. The body was found in the canal about 600 feet below the canal bridge.

The accused made no effort to ascertain whether Joe received a mortal wound. He ran away. When Joe's wife made inquiry about her husband, the accused answered that he saw him last on Sept. 17, 1921, when he was at the lodging-house of the accused.

He prepared for flight and had his grip packed. It contained a new revolver and cartridges, although the accused testified that he threw the revolver with which he did the shooting into the canal. No knife was found at the place of the killing.

The accused started to run away after the body was found on Sept. 20, 1921. He was in the trolley car on his way to Philadelphia. While seated in the car he saw Mr. Sarni, the detective of the Norristown police force, who addressed him in a friendly way. He concluded that he was not suspected by the officer, and, therefore, ended his flight at the first station beyond Norristown. Mr. Sarni is an Italian by birth, and the accused knew him as an officer of the law.

The accused called a number of witnesses who testified to his good reputation. He also called a number who declared that Joe had the reputation of being a bad and dangerous man, especially when under the influence of liquor. The accused, however, admitted that he had never heard of this bad repute and knew him only as a good friend. The accused made a statement at City Hall and explained his connection with the killing of Joe, as already recited.

We have given in substance the evidence submitted to the jury, except that of the witness Pelligrino Borelli, who was called by the Commonwealth.

The only reason for a new trial that calls for any consideration relates to the testimony of this witness Borelli.

It was necessary, in our opinion, to set forth fully the other evidence in the case, otherwise the relevancy and importance of the Borelli testimony cannot be properly determined.

Pelligrino Borelli testified that he had a conversation with the accused last summer at the De Kalb Street Station in Norristown; that Cantanzariti, the accused, said that Joe, the dead man, had charged him, Cantanzariti, with shooting Joe in the shoulder; that this was a false charge; that he, Cantanzariti, did not do the shooting; that it was done by a man who had returned to Italy, and that he, Cantanzariti, would get the hide of Joe, the dead man, if it took him three years to do it.

2 D. & C.

Commonwealth v. Cantanzariti.

The district attorney had some trouble in obtaining from the witness the positive declaration that the accused disclosed the name of Joe, the deceased, whose hide the accused intended to take. At first the witness claimed that he did not fully understand the interpreter. We then obtained another interpreter, and the witness stated that he fully understood him. It was then that the witness admitted that the statement he made to the district attorney was correct, and that the accused did refer to Joe, the deceased, as the man who had made the false charge.

Borelli was the sole witness who testified to a motive or threat on the part of the accused. There was no testimony to corroborate or to contradict his evidence other than the denial by the accused.

We cautioned the jury to consider this evidence carefully and determine what weight they would give to it.

The jury might well have given full faith and credit to this testimony, and charged the apparent hesitation to the reluctance of the witness to testify against his fellow-countryman, when his evidence might weigh seriously against the accused charged with this grave offence.

The verdict was rendered on Wednesday, Feb. 22, 1922. On Saturday of the same week the witness sent for the counsel of the accused. He stated to the attorney, in the presence of others, that he could not eat or sleep and that he saw animals and flames that disturbed him. He said that he never had any conversation with the accused about Joe, the deceased, and that his evidence at the trial was false in every respect. He said that he wanted the court to know that he swore to a lie. He also claimed that the detective, Frank Sarni, induced him to give this false testimony. He was taken before a justice of the peace and made an affidavit setting forth that his evidence in court was false. He stated in this sworn declaration all the alleged circumstances under which his perjured testimony was given. This affidavit was filed in court and assigned as the principal reason in support of the motion for a new trial.

We do not see how a stronger confession of perjury could be set forth. He declares in the affidavit that, his conscience troubling him, he made an appointment with the priest to confess his sin in swearing falsely against the accused.

When Detective Sarni heard of this affidavit charging him with subornation of perjury, he called on the witness Borelli. Mr. Sarni asked him whether it was true that he made an affidavit charging him, Sarni, with compelling the witness to make his original statement at City Hall. The witness replied that he made no such affidavit before the justice or counsel for the accused. Mr. Sarni then took the witness before Justice Kehoe, where he subscribed his name to the following affidavit:

"When I came to Norristown—Louis Chicarino brought me over—Frank Sarni never threatened me in any manner at the City Hall. Louis Chicarino was the interpreter, and before I testified, no one threatened me in any manner, and whatever I said, I did and said voluntarily."

Officer Sarni was interested in freeing himself from any charge of wrongdoing. The witness retracted all that he said about Officer Sarni's subornation, but, so far as the original affidavit on file is a confession of false swearing by the witness at the trial in court, there is no retraction. The witness can say that the charge made against Sarni is false, but that the affidavit in all other respects is true. The retraction of the part of the affidavit referring to Officer Sarni does not affect the evidence of the witness at the trial.

Depositions were taken on the rule for a new trial. They show that the witness made a voluntary statement at City Hall, giving the conversation he had with the accused about Joe. This same statement was also given in the office of the district attorney and by the witness at the trial.

These depositions also show that the affidavit confessing the false swearing was voluntary and taken at the earnest solicitation of the witness.

Lastly, the depositions show that the retraction as to the charge against Officer Sarni was made voluntarily.

The witness Borelli was not examined by the defendant or the Commonwealth when the depositions were taken.

The evidence of this witness at the trial was important. It was the only testimony showing any motive for the killing and a threat to kill. Upon these matters the witness Borelli stood alone.

The accused and Joe were apparently living under friendly relations. They ate and drank together at the boarding-house of the accused on the night of the killing. There was no evidence of any bad feeling on the part of the accused at that time. They were in apparently friendly companionship at the lodging-house of the accused. His movements at the Norristown end of the river bridge may have indicated to the jury that he was suspiciously following Joe and seeking an opportunity to kill him. This conclusion the jury might find was well supported by the subsequent occurrences at the canal bridge, but Borelli's testimony was most important upon that point.

It is contended that it is not material to show a motive, where the prisoner admits the killing. This is true as a general proposition, but when the question arises whether the killing was wilful, deliberate and premeditated, the existence of a motive is a material matter. In McClain *v.* Com., 110 Pa. 263, a point was submitted to the effect that absence of motive was material in a charge of murder. The court answered: "We affirm this point if the jury find from the evidence that there was an entire absence of motive, so far as a verdict of murder in the first degree is concerned, but it should not raise a doubt as to his being guilty of murder in the second degree." The Supreme Court said: "We find no fault with this answer." See, also, Com. *v.* Salyards, 158 Pa. 501.

While motive is always an important matter, it does not follow that the evidence may not be sufficient to convict of murder in the first degree, although no motive is disclosed.

Motive is consistent with, and indicative of, the deliberation and premeditation necessary to convict of murder in the first degree.

A threat to kill is also an important factor when the inquiry arises whether the killing was deliberate and premeditated.

Where a man threatens to kill, it is natural that his mind should deliberate upon the subject and the method of carrying out the threat.

Where the circumstances attending the murder may indicate no higher degree than murder in the second degree, a previous threat to kill is important evidence to show that the killing was wilful, deliberate and premeditated: Kehoe *v.* Com., 85 Pa. 127; 2 Trickett on Criminal Law, 811.

It is argued that the verdict of the jury can be sustained even if the evidence of Borelli is eliminated from the case. This may be true, but how can the court say that the jury was not influenced or controlled by this evidence?

We must assume that the jury based its verdict upon all the evidence in the case: Chamberlyne's Hand Book Evidence, § 140.

A reasonable doubt as to the effect of Borelli's testimony should inure in favor of the defendant: 3 Wharton's Criminal Procedure, § 1812.

2 D. & C.

If the present testimony of the witness on a material matter is so far contradictory of his previous testimony as to wholly obliterate and destroy its effect, the court should grant a new trial: Underhill on Criminal Evidence, § 519.

The following rule is suggested in 2 Bishop's Criminal Procedure, § 1273: "That new trials should be granted more freely in criminal cases than in civil, and in criminal more freely in proportion to the gravity of the punishment."

If the court is in doubt whether the verdict would have been different if the testimony on the material matter had been omitted, a new trial should be granted. The reason given for this test is founded upon the rule that a doubt of this character should inure to the benefit of the prisoner. We are aware that courts do not favor the granting of new trials upon the ground of the perjury of a witness. In 20 Ruling Case Law, 294, the test is stated as follows: "A new trial should not be granted unless the testimony of the witness sought to be impeached was so important to the issue and the evidence impeaching the witness is so strong and convincing that a different result must necessarily follow." But this rule applies to civil cases rather than criminal cases. We do not find that it is so rigidly enforced in criminal cases, especially when the penalty is death.

It is also important to observe the distinction where the witness in a criminal case himself makes affidavit that he committed perjury as to his entire evidence at the trial.

One of the early cases in Pennsylvania upon this subject is Com. *v.* Flanagan, 7 W. & S. 415. The defendant was convicted of murder in the first degree. The danger was pointed out, if the rule was not observed, "that a new trial should not be granted upon after-discovered evidence, impeaching a witness who testified at the trial." But in this case the evidence impeached was largely cumulative. A new trial is never granted when the evidence is merely cumulative or where it does not relate to a matter material to the issue. But in the case just cited we find that the strong opinion against granting a new trial where a witness is impeached is followed by the more important general rule: "That after a verdict, where a motion for a new trial is considered, the court must judge not only of the competency, but of the effect of the evidence. If, with the newly-discovered evidence before them, the jury ought not to come to the same conclusion, then a new trial may be granted." The after-discovered evidence in that case consisted chiefly of proofs that the witnesses at the trial gave false testimony.

The authorities whether a new trial should be granted upon perjured testimony at the trial were carefully reviewed in McEvoy *v.* Quaker City Cab Co., 267 Pa. 527. The application for a new trial or the opening of the judgment in that case was made after a final judgment in the Supreme Court. This feature of the case was noted. In our case the application for a new trial does not arise after judgment. In a criminal case there is no judgment until the sentence is pronounced. It is also shown in the case cited that the perjured evidence at the trial must be extrinsic and not intrinsic. The evidence is extrinsic when the action or conduct of the prevailing party prevented the losing party from presenting a fair submission of the controversy to the jury. For example, where the defeated party was fraudulently prevented from appearing to make his defence.

To the same effect is Powell *v.* Doyle, 77 Pa. Superior Ct. 520. This case, however, draws the distinction very clearly that if the intrinsic evidence as to perjury had been submitted before the entry of judgment, the court would have granted a new trial.

In Com. *v.* Brady, 76 Pa. Superior Ct. 488, the court refused a new trial where one of the witnesses for the Commonwealth alleged he committed perjury at the trial. But the deposition of this witness was only cumulative testimony, and he was an inmate of a penitentiary. The appellate court determined that it would not interfere with the discretion of the lower court. The court laid down the well-established rule that the newly-discovered evidence must be such as could not have been produced at the trial by the exercise of reasonable diligence, that it must not be merely cumulative and that it should render a different result probably on a new trial.

We do not see how the defendant or his counsel could be prepared to meet the perjury of the witness Borelli. The evidence was a surprise, so far as we have any testimony upon the subject. We do not see how the defendant could have prepared to answer the perjury. The only parties to the alleged conversation at the De Kalb Street Station were the defendant and the witness Borelli.

Where a verdict is obtained through perjury, the court may grant a new trial *nunc pro tunc:* Wickel *v.* Mertz, 49 Pa. Superior Ct. 472.

There are numerous cases in our lower courts where new trials were granted because a witness committed perjury. In Com. *v.* Nichols, 23 Lanc. Law Rev. 91, the defendant was convicted of larceny. New trial granted because the principal witness declared that he gave false testimony.

In Com. *v.* Yot Sing, 7 Kulp, 349, Judge Rice declares that a new trial should be granted to prevent a papable wrong where a witness testified falsely at the trial.

In Com. *v.* Stoy, 25 Dist. R. 937, a new trial was granted because of the perjury of a witness. The court referred to the opinion of Judge Rogers in Boyd *v.* Boyd, 1 Watts. 365, where the distinguished jurist said: "A motion for a new trial is an application to the sound discretion of the court, and is not governed by the technical rules applicable to a writ of error."

Whether the perjury of a witness is sufficient cause for a new trial is a matter resting in the sound discretion of the court: Shanahan *v.* Insurance Co., 6 Pa. Superior Ct. 65.

A mistake by a witness on a material matter relating to the issue, held sufficient to grant a new trial: City Trust Co. *v.* Shoff, 17 Dist. R. 857.

In Com. *v.* Roddy, 19 Pa. C. C. Reps. 321, the prisoner was convicted of murder in the first degree. Two witnesses testified at the trial that they saw the accused near the house of the deceased on the night of the murder. Afterwards it appeared that the witnesses made a mistake or swore falsely, and that the time they saw the accused was at least a month before the date of the murder. A new trial was granted on the ground that the depositions took the two witnesses entirely out of the case.

In Struthers *v.* Wagner, 6 Phila. 262, after a verdict, it was shown by the affidavit of Anna Thompson that a witness at the trial swore falsely to a material matter at issue. Depositions were taken and it was intimated that some art was used to induce Anna Thompson to make the affidavit. On her cross-examination she seemed disposed to equivocate. Judge Sharswood, in granting a new trial, declared: "But in such a case as this, even if the new testimony were open to damaging comments, we think that justice requires that the defendant should have the opportunity of having the whole evidence submitted to another jury."

The American authorities are not uniform upon the question whether a new trial should be granted where there is evidence that a witness committed perjury at the trial.

2 D. & C.

Commonwealth *v.* Cantanzariti.

We are convinced, however, that the weight of authority is in favor of granting a new trial where a witness upon a material matter at issue himself swears that he committed perjury. But it should also appear that his evidence was not cumulative, and that, if eliminated from the case, the proofs at the trial would be silent upon said material matter. We think this rule is freely applied where the penalty for the offence charged is death.

In Myers *v.* The State (Arkansas), L. R. A., 1915 C, 302, the prisoner was convicted of rape, for which the penalty in that state is death. The principal witness afterwards made affidavit that her testimony against the accused was false. At the taking of new depositions for a new trial she reaffirmed her original evidence. The judge refused a new trial, but the appellate court reversed and ordered a new trial.

In Dennis *v.* The State, 2 N. E. Repr. 349 (103 Ind. 142), a principal witness made contradictory affidavits after the trial. The court awarded a new trial, saying in effect that it was impossible to determine what a jury might do upon the new aspect of the testimony of this witness.

In Seward *v.* Cease, 50 Ill. 228, an all-important witness made affidavit that his testimony at the trial was false. The judge refused a new trial, but the appellate court awarded a new trial, saying: "This, then, is not a case of conflicting evidence. An unrighteous judgment has been obtained upon perjured testimony, and the perjury is shown, not by uncertain admissions of the perjurer, but by his own oath, voluntarily made for the purpose of repairing his wrong. A stronger case could hardly arise."

A trial judge should set aside a verdict obtained through perjury: Serwer *v.* Serwer, 75 N. Y. Supp. 842; Chapman *v.* Del., L. & W. R. R. Co., 92 N. Y. Supp. 304.

Where affidavits submitted raise a presumption that the testimony given upon a crucial point was perjured, a new trial should be granted: Piper *v.* State (Texas), 124 S. W. Repr. 661; State *v.* Powell (Washington), 98 Pac. Repr. 741.

The court must consider what the probable effect would have been upon the verdict of the jury had the testimony of the witness been presented to them as it now stands before the court. If he cannot solve this problem, it follows that the accused should have a new trial: Benda *v.* Keil, 69 N. Y. Supp. 655.

True, the witness Borelli may have told the truth at the trial and may now seek to save his fellow-countryman by introducing a false affidavit. But we have no evidence before us upon which we can base such conclusion or inference. He may have been threatened or unfairly influenced to make the affidavit. But, again, we say, where is the proof upon which such findings can be based by the court?

We are aware that a new trial will add expense, annoyance and loss of time, and that the second verdict may confirm the first. But a life is at stake, and we dare not act upon mere speculation.

We do not wish to evade our responsibility, but a judge, before he sends a man to the electric chair, should have the support of a verdict upon evidence that is not tainted with perjury.

We have a right to know what conclusion the jury would reach upon the testimony as now presented to the court before we pronounce the sentence of death.

We have no verdict of a jury based upon the evidence as it now stands before the court. A judge cannot send a man to the electric chair, although

convinced that the evidence justifies such judgment, unless the prisoner pleads guilty and submits his case to the court to determine the degree of guilt.

Because of the importance of the case, we have given much time, research and study to the application for a new trial. We cannot see any way to carry the verdict into execution as the case now stands before the court.

And now, April 24, 1922, the fifth reason for a new trial is sustained, the rule is made absolute and a new trial is granted.

From Montgomery Evans, Norristown, Pa.